May it please the Court, I'm David Weickhoff for Mr. Holland. With the Court's permission, I'd like to reserve seven minutes for rebuttal. It's granted. Thank you. This case, like most habeas cases, has issues of exhaustion and procedural default, which consume a lot of the briefing. But I don't want to leave the Court to lose sight of the fact that there are several issues here for which there are no exhaustion or default issues. Namely, the jury obstruction claims, the prosecutor's comment on silence, and the penalty phase ineffectiveness claim. And I'd actually like to start by discussing the last of those, the ineffective assistance of counsel at penalty phase. And with the Court's permission, I'll get to the default issues in a few minutes. The part of the ineffectiveness of penalty that's plainly exhausted, there are three parts to it. One is counsel's failure to get any of the many records that were available for Mr. Holland, failure to get a mental health evaluation for sentencing, and counsel's making prejudicial comments to the jury in his closing arguments or speeches to the jury. Those three things were all fairly presented on the PCRA appeal, so there's no default issues about them. I'd like to talk about those. In terms of counsel's failure to get the records, it's plainly deficient performance under Ron Pilla. These records were created in connection with the convictions that were going to be used by the Commonwealth to create two pretty aggravating circumstances, and counsel under Ron Pilla had a duty to look at them. It's also deficient performance under Williams and Wiggins because it violated counsel's duty to do a thorough investigation for mitigation. What's wrong with the state's argument that putting that type of information into the record would have just made the jury more aware that this is a man that has not led a very decent life? There are two aspects to the answer to that, Your Honor. One is that in terms of counsel's investigation, that would be assuming there's stuff bad in the record. You can't use hindsight because this lawyer never knew what was in the records. Assuming that, in other words, the argument is it's harmless in any event because if he had known of these records and put it into evidence, many lawyers would not have used that evidence because they didn't want to alert the jury that this is a man who perhaps is deserving of the death penalty. In fact, Your Honor, the records actually portray Mr. Holland's past in a much more sympathetic light than what the jury heard. The jury heard actually from defense counsel and from the prosecution that he had this history of convictions, and the defense counsel himself actually suggested that he had many more crimes than he would have ever been convicted for when he solicited that from the police officers. The records actually show that these prior convictions, first of all, the records prove that none of them involved any violence. In fact, some of them were not even with actual weapons. But didn't the records show, though, that counsel actually did talk to family members? Yes, Your Honor. I mean, he wasn't completely blind to the guy's past. Let me just finish with Judge Cowden and then I'll get to that. And the records also show that his entire past history of criminal convictions that the jury knew about, as one court evaluator said, were the result of alcoholism and mental problems. So they actually portray his history in a mitigating light. Now, to get to your question about what counsel knew, what counsel knew actually highlights how deficient he was here because counsel knew from speaking to the family members as far back as the suppression hearing before trial, counsel knew that Mr. Holland had a history of mental health problems. And, in fact, part of counsel's theory at the suppression hearing was that the police also knew about these mental health problems because the mental health problems were documented in connection with his prior convictions. So counsel, from what he knew, knew he should look into these prior mental health problems. In fact, the family, the mother and the grandmother testified as sentencing very briefly. They talked about this, that Mr. Holland had mental health problems and had never gotten any help. Again, any reasonable lawyer before putting someone on the stand to cite that would have seen if there was anything to back it up, which, in fact, there was a great deal. These are all apropos as to the penalty phase, not the guilt phase. You're not claiming that any of this would have been sufficient to prove that he of important or insanity defense of any kind. No, there's no issue of insanity defense here. There is at the guilt phase an issue of intoxication, which I'll get to in a minute. But I'd like to continue with the penalty phase. But as far as this is concerned, you're talking about the penalty phase alone. Yes, Your Honor, that's right. I wanted to start there because there's no procedural bar issue at all. In addition to the records, of course, those failed to get a mental health evaluation for sentencing. And Dr. O'Brien, who testified at the post-conviction hearing after reviewing Mr. Holland's history and interviewing Mr. Holland, made all kinds of mitigation that could have been presented here about both about Mr. Holland's history and about his mental state at the time of the offense, including that he had extreme mental or emotional disturbance. So there was tons of mitigation here that could have been presented by a lawyer who was prepared. The records and so on actually undermined the aggravation by showing that it was the prior crimes were done by someone who was intoxicated and mentally ill, not by just some cold-blooded person. The mitigation evidence also undermines the torture aggravation circumstance by showing what Mr. Holland's mental state was. But in addition to the prejudice from the failure of investigation, and that's like the sort of Ron Polo, Williams, Wiggins line of cases, failure to adequately investigate, there's another issue here, which is the unbelievable prejudicial comments that this lawyer made to the jury, starting from the opening statement when he told the jury, it sounds like a joke, but he didn't do it, and even if he did, he was drunk at the time, when he told the jury, Mr. Holland will testify and nothing will be hidden from you, even though he was counseling Mr. Holland to not testify. And then when Mr. Holland didn't testify, he gets up at the penalty bed and says, I gave him every opportunity to testify, and he declined it. This would have been misconduct if done by a prosecutor. It's incredibly harmful to have your own lawyer do this stuff. But at the time, at the time the client was was was he at the beginning? I think he said he would take the stand and then he changed course. Right. What's the lawyer to do? The lawyer is to not promise that he will testify. This lawyer knew there's a chance Mr. Holland wants to testify. The lawyer said I've advised him not to. He'd obviously counseling him. You don't get up and promise you especially don't get up and promise he will testify and nothing will be hidden from you. Because then when he doesn't testify, what's the jury to think from that? And finally, is that the lawyer's fault or the client's fault? I mean, you know, it's easy to blame everything on your lawyer at this point, but he changed his mind. Certainly, Mr. Holland changed, apparently changed his mind about testifying. What is the lawyer's fault, though, is for getting up and making that promise at a time when he's at the same time counseling Mr. Holland to not testify? Well, but he, you know, you're putting the lawyer on the horse of the dilemma here. It certainly sounds good to make an opening statement and say, look, ladies and gentlemen, we're going to tell you everything. We're going to tell you the good and tell you the bad. Our man will be up there and so forth. It's unfortunate that he changed his mind because I think he could have been his best witness, but it was his choice to make him. Is it fair to blame the lawyer for that? I think it's fair. It's fair to blame the lawyer for making that public declaration. That's the problem. But there's a lot of other stuff he did, of course. At the penalty phase, he gets up and he says the case is full of aggravating circumstances. The aggravating circumstances are plentiful. Incredibly, he tells the jury that the central point of their deliberation should be, can he change from being a predator among civilized people so that if he gets out of prison, he won't be dangerous? This is in a state where there is no parole for a life sentence. He tells the jury basically to look at future dangerousness, and he doesn't even give them any evidence to suggest that Mr. Holland could change from what he called being a predator among civilized people. In fact, he himself, this lawyer, called Mr. Holland a monster, a brutal animal, a professional criminal, a man with a criminal mind who knows what he's doing. My point being that if you take the combination of these things, all the mitigation that could have been presented and wasn't because of counsel's deficient investigation, plus these astonishingly harmful comments that the lawyer made that I've never seen anything like it in any other case that I've worked on. This is clearly a case with a deficient performance and prejudice at the penalty phase, and relief should be granted on those grounds. Now, yes, that was not raised in the state court, Your Honor, and that's one reason I was putting it aside for a moment because I wanted to just talk about things that were fairly presented. And I will talk about that. Now, so, as I said, there's several issues. There's no procedural default issue at all for those. There is a procedural default issue for the AIC claim, as Your Honor pointed out, and for a few other aspects of the guilt phase claim. There's a procedural default issue. In this case, the procedural default issue is actually not very difficult because, or not difficult at all, because under this court's precedent in Bronstein and similar cases like Tremaine, Laird, Jacobs, and several other cases, this court has held over and over and over again that at the time Mr. Holland was litigated in state court, the Pennsylvania Supreme Court applied what was called the relaxed waiver rule in capital cases. And there were no firmly established and regularly followed bar rules at the time. Let me ask you a question about that because you paint that argument with a pretty broad brush. Your adversary made a point in their briefs to point out that actually Mr. Holland's PCRA claim was pending when Malbrecht was decided. And they suggested that perhaps Mr. Holland could have at that point moved under his Rule 2501 to stay in remand to assert all these other claims. I didn't see any response to that in your brief. Maybe you can address that. Sure. Yeah. What happened is that his PCRA appeal had actually been submitted to the Pennsylvania Supreme Court, and then Malbrecht was decided. Right. Now, what Albrecht held, keep in mind that Commonwealth versus Albrecht, is that anything that wasn't raised in the lower PCRA court is barred. So at that point, the day Albrecht, the second Albrecht was decided, everything that Mr. Holland had not already raised was procedurally barred under state law. So there was nowhere for him to go. The Commonwealth suggests basically that Mr. Albrecht should have pursued remedies that the state courts said are not available. That can't possibly be right. There would be no purpose in doing that other than to vex the state courts and delay federal aid. Why couldn't he ask for a remand back to the trial court to hear the unexhausted claims? Because Albrecht held squarely any claims that he hadn't already raised in the lower court were barred. There was no mechanism to hear them at that point. Well, there is if you ask for a remand. It's remanded back to the time that your original PCRA was heard. But Albrecht said it was too late. There was no, I mean, in Albrecht itself, for example, Mr. Albrecht, there were several claims he didn't raise in the lower court. They were then raised on appeal along with a request for a remand. And they said, no, we're not going to do this anymore. No more relaxed waiver. So he was really in the same shoes as Mr. Albrecht on that. So, so given that, I mean, the Commonwealth's made a lot of arguments about default, but I think it's actually straightforward in this case. Now, let me let me talk a little bit about the guilt phase claims because they are substantial. And keep in mind, this is a case where, as the district court found, the only viable defense here at the guilt phase was a mental state defense. Mr. Holland had made two confessions, which were very detailed. As the state court said, there was not a scintilla of evidence that they were involuntary or unreliable in any way. And there was no question that Mr. Holland was the person who did this offense. In light of that, first of all, remember, counsel stands up and says he didn't do it. And even if he did, he was drunk at the time, which is the punchline to a joke, but it's not a proper opening argument. He also, as I said, he makes a promise about testifying, which he, which is then broken. He did a lot of other stuff. He tells, remember, counsel at the guilt phase introduces Mr. Holland's prior convictions and not just prior convictions, but also suggests that he was a suspect in a string of many other cases for which he was never even charged. So he basically creates the impression that Mr. Holland's a one-man crime wave. At the same time, of course, he doesn't introduce any of the mitigating facts about the prior convictions, which were in the record. So the jury's getting, and then remember, he tells the jury in a case where the only viable defense is a mental state defense, he tells the jury this was a cold-blooded killing by a professional killer, a monster, a man with a criminal mind. What does the mental state defense do? Does it reduce the degree of the conviction? Yes, Your Honor. The only, the viable defense here really was an intoxication defense, which reduces from first, down from first degree to this, because it probably would be second because it's a commission of a felony, so it's felony murder rule. But you're not claiming that there was enough evidence in the record here from which an intoxication defense, by way of diminution, would have been successful. I mean, the only witnesses, no one testified. There was no one available to say that he was dead drunk when he engaged in this act. Certainly, the evidence counsel put on didn't support the intoxication defense because, again, in just remarkable ineffectiveness, the bartender comes in to testify about Mr. Holland's drinking. He comes in and he tells the court, I'm worried about liability for serving so much booze to Mr. Holland. Counsel says, okay. Puts him on the stand. He says, why did you serve? The bartender says, well, I served him one drink and I'm sure I wouldn't have served him if I could see that he was intoxicated, which is exactly what he had to say to evade liability under the Gramshop law. But the jury never knows that he came in worried about liability. But you haven't identified any witnesses that would have testified to his total intoxication, sufficient to make a diminution of the charge. We didn't actually have Mr. Fulcher, Your Honor. We had the affidavit from Mr. Fulcher who was drinking with Mr. Holland. That wasn't available at that time. It was available. If counsel had interviewed Mr. Fulcher, it says in his affidavit, here's what happened. I was subpoenaed to court. I had no idea why I was there. I was put on the stand with no preparation, no interview. I thought I had to basically minimize our drinking or I was going to be in trouble. I didn't know what was going on, so I said we weren't drunk. If counsel had told me the situation and interviewed me, I would have told the truth, which is we were both extremely intoxicated. So that's the evidence that a reasonable lawyer could put on if he had actually talked to the witness. Would that have been enough for a charge or even if the charge would have been given to realistically think the jury would have acquitted him or rather would have made some diminution of the charge? It certainly would have been enough to get an instruction. Keep in mind also it would have changed the extra testimony because the extra testimony was limited to the evidence of record, which because of counsel's deficiencies was basically that Mr. Holland was not drunk. So there's that, there's that. There's also, you've got to couple that with the fact that although, as all homicides are, it was a horrible crime, it was not a specific intent type of crime. Most capital cases or first-degree murder cases we see involve a shooting or multiple stabbings. It caused death right away because the person intended to kill. There was really very little evidence for intent to kill here. So you already have one leg up on the intoxication defense, which is basically aimed at getting rid of that specific intent. Counsel, it looks to me like you have about five and a half minutes to go. Perhaps you could turn to the AIC argument. Sure. The AIC argument was not presented in state court, but as I've just explained why there's no bar at federal merits review of it, and Judge Van Antwerp in actuality found no bar for a different reason, which is that the public counsel was ineffective and they wanted to raise it on direct appeal. So, again, it's here on the merits without a procedural default on them. In terms of the merits, the problem here is that Mr. Holland never had a defense expert. He had an expert who reported directly to the prosecutor and to the court as well as to the defense counsel. And Mr. Holland knew that. And, in fact, it's reflected in his report when he says Mr. Holland was reluctant to talk to me because he knows I'm reporting to the prosecutor. So that's part of the problem. You never have a defense expert and, therefore, Mr. Holland is not, for good reason, not willing to really share with him what was going on at the time of the offense, as he did with Dr. O'Brien and his conviction, in which he admitted that in addition to drinking, it actually injected speed and smoking marijuana as well. So you have someone who's reporting to the prosecution, no confidentiality. You also have someone who not only is he not a defense expert, he's not evaluating for the actual defenses that were available at trial. Dr. Bonovitz evaluated only for insanity and for competency. Now, the insanity defense is a totally different animal than the intoxication defense. So there was no defense expert evaluation. There was no evaluation of any by any expert evaluation for the defenses that were actually at issue, which was intoxication at the guilt phase and then mitigation at the penalty phase. So under AIC, there is a right to a defense expert, and we've fought back and forth in briefs about the extent of that right. But I think it would be very artificial to limit AIC in the way that the common law suggests. And I think, unless the court has specific questions, I'll leave it at the briefs on that issue. I also want to speak briefly also about the instructional issues and the prosecutor's comment. And there's sort of a confluence of issues here. If you think about the defense lawyer's arguments that the jury should focus on future dangerousness, which totally distracted them from the actual issue of whether they should find mitigation in the case. You think about the prosecutor's argument to the jury where he said, well, you heard those mitigation witnesses, but you didn't hear from Mr. Holland, which, again, pushes the jury away from finding any mitigation based on what the actual mitigation witnesses said. You have the counting instruction, which tells the jury, together with the Mills instruction, the Mills violating instruction, basically the jury is told, okay, look at the ads, look at the nets, and count which is more. At which point the jury, there are three ads in this case. And at most, counsel never specifically identified any mitigating circumstance, but the most the jury could have possibly found was something under E8. So it was pointless for the jury to even figure out if they unanimously agreed on this E8 mitigating circumstance because it could never outcount the three aggravating circumstances. So you have a confluence of all these errors here, the instructional errors, the effectiveness of counsel in terms of his argument. I'm putting aside here his counsel's failure to present mitigation. All these errors which lead the jury away from actually considering the mitigation that was presented by the mother and the grandmother, which was not nearly as substantial as what's been presented post-conviction, but was still mitigation that this jury could have found. So I think the court should look at all those issues in conjunction. The bad argument, the prosecutor's comment on Mr. Holland's failure to testify, the Mills violation, and the county instruction, because I think they all act in tandem to create an unconstitutional situation here where the jury was not able to fully consider and fully give effect to the mitigation, which is the key element under the Eighth Amendment for any capital case. If there are no other questions. I don't have any questions. Yes. Okay. No, I don't have any. Oh, I'm sorry. Thank you, counsel. Well, if you want, I'll ask you something. That's all right. Thank you, Your Honor. Thank you. Thank you. Good afternoon, Judge Chigares, Judge Cowan, and Judge Greenberg. May it please the court, my name is David Glebe, Assistant District Attorney from the Philadelphia District Attorney's Office representing the Commonwealth of Pennsylvania in this cross-appeal. Judge Chigares, following up on the letter that I sent to the court last week, I would like to reserve, if I could, with the court's permission, two minutes of my time for the purpose of rebuttal on the single issue that we are acting as appellant. I've discussed that with Mr. Wykoff, and he has no objection. Thank you. That motion is granted. Thank you, Your Honor. I'd also like to express my appreciation to the court for its understanding, not only to me, but to opposing counsel in the briefing state. There were a lot of issues here, and I know both of us asked for extensions of time because of our other pressing cases, and also simply so we could get to all of the issues. I mean, it's a cross-appeal. It's a capital case. The stakes are very high, and with there being so many issues there, it necessarily required not only more paper but more time. Actually, the paper that we submitted to this court was far less than the paper that Judge Van Antwerpen had to look at. When I first saw Mr. Holland's petition for habeas relief, and there were so many dozens and dozens of claims, I thought of what Judge Aldiser used to say about appellate advocacy. He's a fellow Pittsburgher like me, and maybe that's why I like his advice. In appellate advocacy, there are usually one or two claims that end up having merit, and when you put dozens and dozens of claims in, it doesn't show the strength of your case. It shows the weakness. But in this case, this court, one of you— Yeah, but you know, the problem with that is in the next case, the lawyer in the first case will be accused of being incompetent in raising the issue. That's exactly right. That's why they raise it. I don't blame them. And there are just too many there, and all they need is really one claim. There's also been a number of books written in which claims were made which the lawyer making them thought were their third-rate claims, which won the case. Right. And not their—so, you know, I don't know if you would say— Which it's possible that could be argued in this particular case, too, because the sole claim that we are appealing is a very narrow claim. Actually, one of the things that this court has that's an advantage to this court is a very comprehensive, detailed look at every single one of those claims and subclaims by Judge Van Antwerpen. It's just amazing the amount of attention and the amount of detail. And so, to the extent that that's in the record, I think that's a very help to the court. We're turning to this case here. Now, past the default question on the Ake claim, you have to acknowledge that the petitioner would have been entitled to his own examination if he would have asked the court for it. There's no question about that, is there? Well, Your Honor, that's exactly what he did do. His attorney, even before Ake was decided, asked the court for a mental health expert to evaluate him on the issue of sanity and also asked for additional expert help. Well, the expert he got was not what he was entitled to under Ake. He was entitled to not a court-appointed, not a court expert. He was entitled to his own expert, which he didn't get in this case. Well, Your Honor, that's actually a point of contention, I think, between the parties. Well, that's a big point here. Before we get to procedural default, why don't we shake that out? Well, Your Honor, I think both parties have done a lot of research on that. One of the books I looked at right before coming to this argument was Professor Lefebvre's Treatise on Criminal Procedure, and he looks at exactly that point and says, what kind of expert does Ake require to be appointed? Is it satisfied simply by a neutral expert, or does it have to be a defense advocate? He said the courts are split. Most courts, and this is Professor Lefebvre looking at a summary of the courts, most courts actually say that a neutral expert satisfies Ake. But doesn't Ake itself say that one is necessary to prepare a defense? Does it say exactly to prepare a defense? Yes, but Ake also, if you read Ake carefully, it never says that the person who is supposed to be appointed is to serve the same role as an attorney, as an advocate. It talks about, in fact, I read Ake very carefully on this several times, the court in Ake specifically talks about accuracy. We want an accurate determination. We want accurate determinations of both the guilt phase, possible defenses, and it also goes into the sentencing phase. Now, if the intent of Ake is to appoint a defense advocate, a defense expert advocate, an advocate is different from, actually that phrase itself is strange, which is what Justice Rehnquist pointed out in his dissent in Ake. An expert is supposed to get to the truth of the matter. It's not simply supposed to win. And so, in this case, you had Majeed, who was Holland's lawyer, asking even before Ake, I want an expert on this to help me develop this possible defense. And I think it was important that Majeed himself indicated to the court that he did not consider Dr. Bonovitz, who was appointed, to be impartial. He wanted him to be able to help him not only on the insanity defense, but any other possible guilt phase defense, and in mitigation. And it was Majeed's own personal ethic who said there simply wasn't enough there. How can he not be anything but partial when he's, well, I wouldn't say partial, of the court expert, not the petitioner's expert, when he's reporting to both the prosecutor as well as the defendant? It'd be difficult to say anyone is not other than, is not your witness, is not partial to you if they're reporting to the other side. Well, Your Honor, there's something to be said for that. Wasn't that the end of the game? Well, the problem is that... In other words, even when the petitioner sits down with the expert, if it's his man that's not going to be confiding in the other side, he's going to tell him things that the expert will discount or whatever. But if he's telling him things, if he tells him everything, both sides are going to know, and the prosecutor is going to use that. So how could it be other than saying that he's entitled to his own expert? Well, Your Honor, I very strongly urge the court to look at Aik and let it speak for itself. I think when you read the opinion itself, it not only talks about... Let's suppose the court is correct. Let's suppose that Holland was entitled to his... Well, we haven't made up our mind yet. We're talking about it. I don't know. I haven't made up my mind. I'm sure we have in confidence, so we don't know how we're going to look at Aik. Let's suppose for the sake of argument that's correct, that it's supposed to be a defense-oriented expert. The problem is Aik doesn't simply say that, doesn't simply set up an open-ended right to that. It says when the state proffers expert testimony, either in the guilt or the sentencing phase, because of due process concerns, the indigent defendant has the same right to that kind of assistance. And that's simply not what happened here. The state did not proffer psychiatric expert, any kind of expert. I'll take that back. Any kind of psychiatric expert testimony on guilt or on the sentencing phase. I'd also like to add that one of the things that cuts through a lot of this, I think you can take right from Justice Rehnquist's dissent once again. I wish it had been the majority opinion. He said that the issue that the Commonwealth is focusing on, which just deals with the penalty phase, is essentially dicta. There really isn't a holding in Aik involving the appointment of an expert for the sentencing phase. But the other courts have said that Aik applies to both phases. They have said that. That's correct. But I'm looking at Aik itself. This expert would have been good with the sentencing, but on the guilt phase, looking at this as a piece of litigation, criminal litigation, you've got to say the only chance he had was to get up on the stand and say, look, I was dead drunk and I did it. There was no question he was the man involved and so forth. And wouldn't an expert have been the only way he could have made the day and then impeach the bartender and his drinking buddy? Well, Your Honor, the original intent of appointing Dr. Bonovitz was to question and to examine Holland on the question of insanity, which is exactly what he did. Well, insanity is not the defense he wanted on the guilt phase. He was not saying he was insane. But going back to Aik, it's interesting that that's exactly what Aik had to do with. In that particular case, but the opinion reads much broader than an expert for purposes of insanity. The opinion can't be read that broadly, I agree. But it's an expert who was there to rebut the state's experts or to respond to the state's experts, which simply didn't happen here. That is a condition for Aik. In fact, as I pointed out in my reply brief, even when you look at the oral argument in Aik and when you look at the briefs in Aik, that question wasn't even before the court. It was a conditional right. But how do you respond to the petitioner's position on the guilt phase that if they had their own expert and if the petitioner would have testified, the expert could have said, assuming he had 10 beers, and assuming he had the other facts that were in the record concerning his background, it would have mitigated it to some extent. This is an intemperate, it's emotional, it's not a vicious, cold-blooded killer, which on the guilt phase was his only chance of doing anything. And your honor, that's... Why isn't the Aik, even on the guilt phase, very dispositive as to why he was given an unconstitutional guilt phase trial? Well, your honor, I think the answer to that is straightforward. In fact, Holland's counsel attempted exactly that. With Bonovitz. That's exactly right. He tried to get Dr. Bonovitz. If you look at the in-camera discussion before they went before the jury, he was going to try to get Dr. Bonovitz to testify as an expert to exactly that fact. It was the trial judge who said, you just don't have enough underlying background facts of the drunkenness. And as your honor pointed out, if Bonovitz had come up and made that kind of argument, and if Holland had testified and said, yes, I was dead drunk that night, that's correct. I think that would have been his best chance. But wouldn't a good lawyer have told the petitioner, look, your only chance of beating the death penalty in this case is to get up there and say you were dead drunk and this was aberrational, that you're sorry and you lost your head. So why, given that situation, and he wasn't given that advice, he wasn't given that advice, obviously he didn't recommend, well, he did recommend that he take the stand. Well, Holland's lawyer recommended, I'm sorry, your honor. As I understand, he told him not to take the stand. He recommended, Majeed, his lawyer, recommended not, and Holland originally said he wanted to, then he changed his mind. How could it be in a case like this where the identification is absolute? How could it be other than ineffective assistance when your lawyer looks at the facts of this case, it's a piece of litigation, and says, look, you haven't got a chance in this world unless you get up in the stand and say how drunk you were and bring in the bartender and your drinking buddy. Well, your honor, first, we really don't know what the discussions are because of attorney-client confidentiality. We really don't know what those discussions were between Majeed and Holland. But I think that's correct. That would have been a possibility. But I think if the court looks at the entire trial, especially Majeed's cross-examination of the witnesses, and especially Majeed's extensive fin closing comments to the jury at the guilt phase, he was really attempting to try to call the Commonwealth's identification of Holland as the killer into question. He was trying to knock out the confession, saying they were coerced, that Holland thought he was going to be shot if he didn't confess. And he was trying to draw a contrast between the act, the physical act of this murder, which was heinous beyond belief and which couldn't be denied, and Holland, whose character didn't fit into this monster. This is something that Mr. Wyckoff and I have been arguing about since the first day of this case. It's almost as if we're looking at two different transcripts because every time I hear his side of it, I go back and look at the original transcript and I just think we're reading two different trials. But with the lawyer barking up the wrong tree. Your Honor, if he was, he didn't have much of a tree to bark up with in the first place. The facts of the case were a heinous crime and we had fingers pointed at Holland. I think actually if he, and Mr. Wyckoff again, describes Majid's conduct as a joke, I think Majid's conduct in trying to find reasonable doubt on any possible ground can't be an effectiveness, it has to be effectiveness. I think if he hadn't done that, we would be exactly here in the same spot and Holland's counsel would be saying right now, Majid didn't try to call the identification evidence into question. We would be here the same thing. It didn't matter what Majid did. Regarding your aid claim again, you've talked about the case itself, but we're not writing on a clean slate here. Our circuit has considered this scope of aid before and in particular I'm thinking of the Zuchon case and if I'm not mistaken, didn't that case deal also with a neutral psychologist? I think that's correct, Your Honor, although I think that the court did not, I'm not sure that the court granted relief on that particular grounds and I know the court has also dealt with, and I discussed that case and also the Roman case, which was, I think that was a non-precedential case and the one that Judge Ambro wrote, I think it's the Brown case. I think Brown is not precedential. Yes, I think that's right, although it is, it does show that one panel, that some of the panels of this court have examined these types of claims, which arise, which are basically a backup claim to the same kind of claim that's made under the CJA. In a federal case, you say, well, I wanted an expert appointed under the CJA. If not, and if it wasn't appointed, then under due process under AIC, I have this right. But again, the AIC right, when you look at exactly what was before the court in AIC, when you look at the opinion in AIC itself, it is a conditional right. It's not a broad-based, anybody who asks, any indigent person who asks for an expert, a defense-oriented expert, needs to be granted. In fact, I asked the court a question just along those same lines. If that were the case, suppose that's what AIC stood for, and that's 22 years ago that AIC was decided, where are the cases claiming that there was ineffectiveness of defense-oriented experts? Surely there would have been one or two claims by now, and you can't say you have a due process right to a non-legal defense-oriented expert advocate, however you want to characterize it, without saying it's got to be an effective assistance. So it's essentially, where is the jurisprudence, either in the federal courts or the Supreme Court, that says there's ineffectiveness on those grounds? I couldn't find it. And you would expect there would be something like that, if that was really the extent of AIC. Actually, AIC is a very narrow decision. I'm urging the court to look at the original opinion itself. I realize, Judge Chigares, you're correct, there has been interpretation of it. There actually hasn't been that much altogether in 22 years. But the courts are split. The courts are split as far as what satisfies AIC, but what I'm saying here, or what we're arguing, is that even if we characterize the nature of the appointed expert, as Judge Collin is suggesting, it still doesn't apply, because it's supposed to be a responsive or a rebuttal type of appointment when the state presents that kind of testimony first, that kind of evidence, which simply did not apply here. Is your best case, then, the Sixth Circuit Smith versus Mitchell decision? Your Honor, I have so many cases in my mind. I couldn't, can't just pick that one out. If that one is the one that's most consistent, I'll pick that one. I apologize. I can't pick it out of my head right off the top of my head. Your Honor, if the court has any further questions on the AIC claim, that's the only one that we're bringing. I'd be happy to address any other questions on the other aspects of the case. Well, the fault is pretty important here. The district court found that there was default but excused. Yes. The petitioner argues heavily that he doesn't have to reach an excuse that, at the time that this was pending, it would have been very difficult for anyone to say that the district court would have not recognized a second habeas post-conviction case. Well, Your Honor, I think your question to Mr. Wyckoff was exactly on point in that, even after, suppose, given all of the things, the issues on relaxed waiver having to do with the fault, assuming all of that is correct, which I don't think is correct, but assuming that's, even if it is, I think they still had a chance to get a remand to the PCRA level, and so they could have raised these claims. Yes, but that's pretty fancy footwork. I mean, maybe you can't expect the average lawyer to start, and who knows whether the appellate court would have granted a remand back down to the district. That's correct, but the question is, was there an effort made? And I think when you look at the cases on independent and adequate grounds, you have the idea that if you're going to be held that something is defaulted, one of your claims is defaulted, you should know beforehand how to have brought it, and they're saying, no, we didn't know beforehand because relaxed waiver messed up the whole, confused the whole issue. All of the other procedural rules were out the window except for relaxed waiver, which, of course, the Pennsylvania Supreme Court has said the opposite case after case after case. But as of 98, until 98, no one could say clearly a definitive, hey, listen, this relaxed waiver is through, and at this point, if there's a tie, who wins? Let's put it that way. I mean, I could see good arguments on both sides that a cautious lawyer, petitioner would say and overly cautious lawyer would have taken other steps. But until 98, it still was sort of up in the air, wasn't it? Well, Your Honor, I mean, for one thing, this is a capital case, and you would expect capital case lawyers to look at the number of claims that they're going to bring and to say, oh, wait a minute, here's a case from the Pennsylvania Supreme Court saying we're precluded from bringing these cases. We better do something to see if we can exhaust that claim because if not, then we go to the federal courts. The federal courts might knock it out. It seems like just the fact that this is a capital case put the burden even heavier on the petitioner than it normally is. Plus, the jurisprudence that goes back 100 years that says that exhaustion is not the burden of the state. It's the burden of the ones who brings the claim. So I think if it's a tie, I don't think you could really have the tie there. I think that the burden's already on the other side to bring the claim to do everything it can before it shows up in the federal courts to bring that claim in the state courts, and that they simply didn't do that. Actually, Your Honor, the default claim, some of these procedural default claims, and especially in this case, they can get so convoluted. It's actually one of the reasons that I, in my AIC argument, argued the merits before arguing the procedural default issue because the court can deny ABIS relief on the merits without getting to the secondary procedural issues. And in this case, I think it becomes so convoluted as far as levels of review, and as far as cause claims, and as far as whether those were exhausted and how they were exhausted. I think it cuts through it a lot easier simply to go straight to the claim. And I think in a capital case, that may even be more advisable to some extent. And I know this court has expressed that sentiment in some cases, to look at the claims themselves and not to use what the public refers to as technical defenses to get around them. Do you have a comment on, I asked your adversary to respond to your argument about the point when Albrecht was decided you had the opportunity, you could have under the Pennsylvania rule to ask for a remand and stay. You heard what the response was. Do you have a rebuttal to that? I wasn't sure what the response was. I think the response was that it's basically that Albrecht said doors closed, and they had no other option at that point. I think, well, the thing is, if Albrecht had said doors closed, and even if you bring a claim for remand under Pennsylvania Rule of Appellate Procedure 2501, the doors closed, I think that would be right. But I'm pretty certain Albrecht did not say that. I think Albrecht was dealing with the situation from now on during PCRE review. It's not going to apply. So by that, do you mean that if they amended it, it would be as if they filed it as of when the original petition was filed? That's right. That's right. It would have laid it back. Yes. So that the door would have been closed after it was filed, as a matter of law, after it was filed. Well, Your Honor, I think if Albrecht had actually said that for this type of claim and this type of position that I raised, I think that would have been a good answer. But I'm pretty sure Albrecht did not go that far. You know, I thought my question was trying to help you in the sense, what you were saying is that if they made a motion to remand and it was remanded, it wouldn't be barred because you would go back to when the petition itself had been filed. That's right. That's what I thought Your Honor was saying. I thought you were saying that if Albrecht had precluded that. Well, Albrecht didn't deal with that. No, that's correct. I don't think it did. Albrecht didn't have that scenario. No. No. Well, didn't our Bronstein case kind of lament that it would have been nice if Albrecht had a sort of a little bit of an open window, a little grace period for people to file? That's correct. I think Bronstein did make that observation. Although, as I'm pointing out to the court, in cases where the case was already pending before the Pennsylvania Supreme Court, that rule, that Pennsylvania 2501, is simply an equitable rule that allows litigants, after a case has already been submitted to the court, for equitable reasons, if there's a new Supreme Court case or if there's new evidence and you already have your case submitted to the Pennsylvania Supreme Court, after it's been briefed, after it's been argued, it seems like for equitable reasons you should be able to put that information before the state court and say, can we have one more chance here? Here's something new. And that argument could have been made here. Here's Albrecht. Here's why our claim may be considered defaulted and unreviewable on the federal level. We need to present this in full to the state courts. One thing about that eighth claim, though, I think is interesting in that if it is such an obvious due process violation, it's amazing that it took 15 years for anyone to figure it out. Because the case was decided in 85, and yet you had appellate counsel who didn't raise it. You had the Pennsylvania Supreme Court looked at the case on direct appeal. Didn't find anything under 8. You had the PCRA, the original petition under PCRA. That counsel didn't find any problem with it. You had Judge Greenspan conducting extensive hearings. She didn't find any problem with it. And then you had the Pennsylvania Supreme Court look at the case again. All of those courts missed this glaring, supposedly glaring error. And it wasn't until 2000 when Holland finally filed his habeas petition that suddenly, oh, there was an eighth claim. And it was a good due process claim from the very beginning. I think that says something. I think it's suspect. And I think it goes back to your, Judge Collin, to our discussion about whether cake really even applies here or not. And I think that probably, I think it supports the Commonwealth's position here  It really was not that broad. What do you have to say about the petitioner's argument that, well, ache is involved to some extent there. But the only chance this man had was on the guilt phase to testify how drunk he was and that this was aberrational and so forth. And that's not the advice he got. That's not what he did. And looking at this as, you know, anyone looking at this case, I think, fairly had to say, reasonably, that's the only tack you could take. You can't walk away from it. The identification is absolute. Why isn't there ineffective assistance on that, together with, we get ache again, that a medical expert of yours could have said, given these facts, if you believe them to be true, that the conduct was not usual and is different than what you can generally expect. But it was a product of alcohol, the way experts testified. In reading the transcript of this case and looking at how aggressive a litigator Majeed was, despite his criticism now, 22 years later, it would be amazing to me that he did not have exactly those conversations with Holland. Again, it's attorney-client privilege. We don't know exactly what was discussed. And Holland eventually decided not to take the stand. But I suggest very strongly to the court, read the transcript itself and read, especially the pre-trial proceedings, and to see what an aggressive advocate Majeed was. I mean, he was going for an acquittal. He was trying to raise reasonable doubt in these jurors' minds on every possible ground. And when you look at his step-by-step dissection of the Commonwealth's evidence at the guilt phase, it's actually very impressive. I mean, despite the comments, the Monday morning quarterback comments that we have now, and because he wasn't able to essentially accomplish a miracle. But is that a fait accompli, when he knows he's facing eyewitness testimony and bulletproof confessions? That's the problem. Was it a bulletproof confession? There was no eyewitness. There was the victim who was essentially not able to identify, was not able to pick out his face because apparently she said he wore a mask. And there was no fingerprint evidence. I mean, there were holes in the Commonwealth's case. I think it was still proven beyond a reasonable doubt. Don't get me wrong about that. But I think Majeed took what he could, took what he was given to him, and essentially did the best he could under those circumstances. He was not given much. I mean, things looked bad, and I think especially the heinous nature of the crime, which, when you go through the facts, puts an image in your mind that's hard to forget and it's hard to ignore. Okay, counsel, thank you. Thank you, Your Honor. Just a couple of things about the AIC claim. My opponent has stressed that AIC is about accuracy, and that's certainly true. But AIC says over and over again is the way you get accuracy in our system of criminal justice is through the adversarial system. You get accuracy by having one in your defense, have a confidential expert, and not, as the Commonwealth suggests, someone who's biased towards the defense, but someone who is working with the defense and confidential with the defense. That's what they didn't have here. The Commonwealth suggests you can only get an expert under AIC to rebut an expert from the state. That can't possibly be right. If you consider at any guilt fed, that's any mental state defense, there's never going to be a state expert put on first. It's always the defense that has to come forward with a mental state defense at the guilt phase. So it can't possibly be just for rebuttal. And we can't lose sight of the fact that at the guilt phase, this is not just isolated as AIC error. There's this whole sort of spectrum of errors that counsel made that just made this case was like a train wreck. And the Commonwealth says Mr. Majeed was aggressive, but, you know, aggression has to be directed in a reasonable way to be useful in any court, and this was not directed in a reasonable way. Now, as to the bar issues, the Commonwealth has made these same arguments in case after case in Braunstein, in Albrecht itself, which was before this circuit, in Jacobs, in Germain, all of the same arguments in this court has rejected them over and over and over again. The idea that Mr. Holland, after Albrecht, could have somehow gotten review is just... there's just no basis for it. No one has ever gotten this kind of review under this after the case was submitted. And Mr. Albrecht himself, they said, if you didn't present it below, it's barred. It's irrational to think they would have said, okay, you didn't present it below, but since after the case is submitted, you're asking to go back and present it, okay, we'll let you do it. There's just no support for the idea that that would have been possible, and the Commonwealth suggests that to exhaust state remedies, you have to file things that are clearly going nowhere, and that's just not the law. And finally, though, I do want to go back to the penalty phase issue, because this case is just such a clear case on that issue. You've got, from this circuit, you've got Alton, you've got Marshall, you've got Germain. From the Supreme Court, you have Wiggins, you have Williams, you have Montpela. And they all just, case after case, showing this is a case of ineffectiveness. This lawyer, as Judge Van Antwerpen said, was a case of willful blindness. This lawyer stuck his head in the sand. He didn't do the investigation any reasonable lawyer would have done, and as a result, the jury never heard this wealth of mitigation evidences. The district court, for example, said that the records were replete with multiple diagnoses of mental illness and substance abuse. The expert could have testified about the impact of this drug abuse and mental infirmities at the time of the crime, including a extreme mental and emotional disturbance. This is powerful mitigation the jury never heard. You couple the fact that the jury never heard this powerful mitigation with the fact that the lawyer actually harmed Mr. Holland, and both deficient performance and prejudice are clear here. So, again, there's no procedural bar on any issue. His entitlement to relief is super clear under all these precedents at the penalty phase. The ache claim, the ache issue, can't possibly reasonably be narrowed in the way the commonwealth suggests, and guilt-based relief is appropriate also. If there are no questions, I'll stop there. Thank you, Your Honor. Your Honor, if I can just make one or two final points. One of the questions that Judge Collin asked me about the expert and the ache claim had to do with what wouldn't Holland have been more comfortable talking to an expert who was a defense expert. The problem is when you look at all of those psychological reports that are in the record, he has a history. Every time he talks to a psychiatrist, he's aggressive, he's hostile, he's non-cooperative. Even after the sentencing, after the jury finds it sentencing, he meets with Dr. Camille, and this is after everything's done. He acts the same way. I think that diminishes that argument to some extent. Number two, I want to call the court's attention, and I can do this as a follow-up with a 28-J letter to the court, to a decision last week that is important here. It's Richard Washington v. Sabino. In that case, this court upheld the meaning and the necessary import of 2254E1, which in this case, and following up on what Mr. Wyckoff just said, is important in this case because in this case the state court made a finding of fact that said that all of the available mitigating evidence that was available and that was mitigating was put before the jury. There wasn't some mitigating evidence that was missing. Everything that the experts could have said was said and was put before the jury by his family members and by argument and by other references. That was a state finding of fact that has never been rebutted. It's got under 2254E1. It's presumed to be correct. What case is that? It's a presidential case out of this circuit, Washington v. Sabino, number 054522. I vaguely remember. The facts are a little bit different in that case. Oh, that's correct. The fact it's not a capital case. Yeah, well, so I'm glad it's... All right, well... And also, I think just to respond to Mr. Wyckoff's point about certain cases in this jurisdiction that go a certain way on ineffectiveness, there's also the Shelton case, the Zettelmeyer case, and I would commend the court to look at Strickland itself. I think Strickland and Zettelmeyer raise precise, very, very close issues to the issues in this case.  The Zettelmeyer case, that's a really good opinion. I think it does, Your Honor. I highly recommend... I would highly recommend the Zettelmeyer case, which I try to cite in almost every one of my briefs. Well, if there's nothing else, that's... Thank you, counsel. Thank you, Your Honor. Thank you, both counsel, for your excellent briefing and oral presentation of the case. We'll take the case under advisement. Please rise. This court stands adjourned until Thursday, December 20th, at 930 a.m.